Mr. Justice Scott delivered the opinion of the Court. In the Dallas circuit court, Jester recovered damages against Scott, to the amount of $235 50, on account of the latter’s dereliction of duty as a warehouse man. Scott’s motion for a new1 trial was overruled, and the cause was brought here by appeal on a bill of exceptions to that refusal, containing the motion, the evidence produced, and the instructions given to the jury. It appears that Jester deposited with Scott, as a warehouse' man, twenty-nine bales of cotton, and took the customary receipt. That, afterwards, in February, 1848, upon receiving from Bark-man $500, as an advance upon this cotton, Jester passed over the cotton receipt to him, upon agreement that Barkman should-have the customary care, control and shipping of the cotton — should ship it by the first opportunity, and, out of the proceeds when sold, return the sum advanced, interest upon it, and compensation for his trouble, and pay over the residue to Jester. Afterwards, Barkman delivered the cotton receipt to Scott, and took from him a new one in his own name, and at the same time instructed Scott to ship the cotton upon Orberson’s boat, then above, if not loaded, and if it was, then to ship it the next succeeding trip. Some time in the same month of February, Hardy, as the agent of Barkman, employed Orberson to take the cotton to market in his boat, and the latter executed a bill of lading for it to Barkman, bearing date the 19th of February, 1848, Hardy passing over to Orberson Scott’s receipt for the cotton, and giving him money to pay storage at the warehouse at the rate of twenty-five cents per bale. Orberson did not call for the cotton on the trip then in progress, but afterwards, on the next trip, about the last of February or first of March, landed at the warehouse of Scott, and demanded the cotton of him. Scott did not question Orberson’s authority to demand the cotton, or refuse to de--liver it because the storage was not tendered; but refused to deliver it generally,- upon the ground that he had, some time before,, placed in Barkman’s hands $140, to be paid over for him in New Orleans, which had not been paid or accounted for by Barkman.-And at first said, that Orberson could not have the cotton unless-that sum — or the sum of $150, as one of the witnesses testifies-was first paid to him. A short time afterwards, however, — some of the witnesses say a few minutes, others say after Orberson had commenced loading his boats with other cotton, which he had at first declined to take because he was under a pre-engagement to take the cotton in question — Scott remarked to him that he might take all except six bales. Orberson, however, refused to take the twenty-three bales thus offered, saying if he could not get all, he would take none. The cotton was ultimately shipped to New Orleans, on Orberson.’s boat,, some time in the following month of April, was sold, and the proceeds accounted for by Bark-man, through his agent, Hardy, who paid over to Jester a balance of $5535 99. In-the mean time, about the 27th of March, the market price of cotton in New Orleans Had suddenly declined from one to two cents per pound. It afterwards advanced in price gradually and slowly until the market value approached within about one cent, per pound of its former price, and maintained that position throughout the residue of that season. There was also testimony as to the average weight of Arkansas cotton bales, and as to the quality of Jester’s cotton, and of some other matters throwing light upon the facts stated, not necessary to be detailed. There was also some conflict between the testimony of one of the witnesses, and of several others, who all concur as to the demand- of Orberson for the cotton. That conflict, however, was a matter for the jury, which we shall not enquire into, there being the most ample testimony on that point in any event, and no less to sustain every other point of the verdict, if we shall find that the exceptions taken to the admissibility of the testimony of Barkman- and Orberson should not be allowed. One of the objections to Barkman’s competency as a witness, now urged, is that he was security for the costs of the suit in- the court below. This was first raised by the motion for a new trial, and was not taken at the trial. Had it been, the court in its discretion, for. the furtherance of justice, might have permitted another security to have been substituted, and thus removed the objection . Barkman’s bond for cost was on file responsive to a rule made upon the plaintiff below on the motion of the defendant requiring security for costs ; and therefore the defendant below was not surprised, and must be supposed to have acquiesced; like in cases where secondary evidence is allowed to be produced without objection to prove a fact, (Phelan vs. Bonham, 4 Eng.R. 389,) or in cases where the evidence is uncertain and such ambiguity, although prejudicial, might have been cleared up by cross-examination, (Johnson vs. Cocks, 7 Eng. 682.) Accordingly, the court has repeatedly held, in substance, that only such questions as to the competency of testimony will be entertained here, as were raised at the trial in the court below. Main vs. Gordon, 7 Eng. 656. Phelan vs. Bonham, 4 Eng. 393. Wakefield v. Smart, ■ Eng. 488. The real objection taken in the court below to Barkman’s competency, as is manifest when all that is stated in the bill of .exceptions is considered together, was, that he was shown to have had a disqualifying interest in the subject matter of the .suit in exonerating himself from responsibility to the plaintiff below in respect of his own contract with him; and had no reference at all to his obligation for the costs of the suit. * With regard to his supposed disqualifying interest in the subject matter of the suit, it appears that he had had a lien upon the cotton, from which this controversy sprung, for the $500 advanced, for interest upon it, and for compensation for his trouble in shipping and selling it. But this lien had no longer any existence because it lived only in possession, and this had been voluntarily parted with since the cotton had been sold by Barkman’s agent (Hardy), and the proceeds accounted for to Jester. What claim, if any, he had to any part of the judgment to be recovered, does not appear. It was not to be recovered in his name, but in Jester’s. If any lien had been created in his favor upon the judgment to be recovered, it is in no way shown. It was a suit of Jester’s, and not his. He said that “he expected to get a part of the judgment, but that Jester was responsible to him under any circumstances.” But this is not sufficient. A mere expectation of the payment of a debt out of the proceeds of the judgment, however strong, if not amounting to a legal right, has been deemed insufficient to render the witness incompetent. (Server vs. Bradby, 6 Greenl. 60.) And, in New York, it was held, after .an examination of several previous decisions in the State and of other authorities, English and American, that although the plaintiff was in insolvent circumstances, and, after the commencement of the suit, had repeatedly told the witness that if it went in his favor, he would give him an order on the defendant for the whole amount of the verdict in part payment of a debt he owed the witness, and the witness expected to get the order accordingly ; nevertheless that it did not render the witness incompetent. (Ten Eyck vs. Bill, 5 Wend. 55.) In such cases, the interest of the witness is not direct and certain, but contingent, and it goes to his credibility. If, however, an order was actually drawn and delivered to the witness, that would be an assignment and make witness incompetent. (Peyton vs. Hallet, 1 Caines R. 379.) What was the nature of the claim which Barkman had against Jester, on which he expected a part of the judgment to go in satisfaction, does not appear. It is sufficient, however, that Jester was responsible t© him for it under any circumstances, and that he does not appear to have had a specific lien upon the anticipated judgment or its proceeds. With regard to the objection to his competency upon the ground of the tendency of his evidence to exonerate him from liability, and place him in a state of security against a subsequent action by his principal, Jester, the strongest statement of the rule to be extracted from the cases, English and American, after a very full examination of them which we have made, would be, that when a witness, produced for the plaintiff, is so connected with the transaction about which he is called to testify, that a verdict for the plaintiff would entirely relieve him from all liability, he will be incompetent, as being directly interested in the event of the suit. 1 Phil. Ev., 6 Am. from 9 Loud. Ed., p. 107. When such persons act within the scope of their employment and duty, they are in no way liable to their principals in respect of their acts, and consequently cannot gain or lose by the event of any suit concerning such acts. In such case, a verdict for the plaintiff, in an action by the principal against some third party touching any of such acts, could have no beneficial influence in placing the agent, who might be a witness, in any better condition, because he was in a condition of security already. Not so, however, if he had been guilty of any tortious or negligent act beyond the instructions of his principal; for, in that case, being liable to his principal himself, he would be directly interested in fixing the responsibility upon another. This line of competency is aptly illustrated by the case of Wilmoth vs. Munford, (8 Serg. & Rawle 125,) which was an action for goods sold, the same having been artfully obtained by the defendant from the plaintiff’s agent for a note, although the plaintiff’s express instructions were not to let them go without cash down. Upon the trial, the competency of the agent as a witness was objected to upon the ground of interest — that a recovery would shelter him from his principal. The court responded to the objection as follows: “The supposed interest of the witness consists in his being subject to an action by the plaintiff for delivering the goods contrary to orders. But the defendant must not select part of the testimony in the record and reject the rest. Take it all together, and he was not guilty of any breach of orders. For he did not voluntarily give possession of the goods to the defendants. They obtained them by artifice, and without his consent. The plaintiff, therefore, could have supported no action against the witness, and the objection to his competency at once falls to the ground.” When passed upon by these tests, which we think are sound, Barkman was a competent witness. When the whole testimony in the record is considered together, so far from negligence or tort being -prima facie fixed upon him, he is shown to have been not only faithful but vigilant in a high degree. From the testimony bearing upon the point of dates, the inference is very strong that he took immediate measures to discharge the duties he had assumed by taking a new receipt for the cotton from the warehouse man, and at once instructing him to ship it, and almost simultaneously contracted with a carrier for its transportation, through his agent, Hardy, who took the bill of lading, and advanced the money for storage. The same tests will demonstrate the incompetency of Orber-son, who, by his own evidence, showed such negligence as rendered him prima facie liable to an action. But his interest in the event of the suit did not appear until Barkman testified that the ownership of the cotton was with the plaintiff. Until that time, Orberson appeared to be liable to Barkman, and Barkman was no party to the suit. There was, however, no objection to Or-berson’s testimony after his interest was made to appear. If objection had then been taken, it might have been stricken out without the violation of any rule. Indeed, it would have been the duty of the court to have done so, on the motion of the defendant below. 7 Man. & Grainger R. 295, 344. The next ground occupied relates to the instructions of the court. We think these are substantially good. The 6th and 7th are specifically objected to by the counsel; but we consider the objections untenable. It is alleged Qf the former that it was abstract, in so far as it related to a waiver of the right of lien for storage. This is a mistake: there are several items of testimony in the record to which this instruction has appropriate relation. The objection to the 7th instruction is no better taken. Warehouse men certainly have not a general lien authorizing a detention of goods, not only for demands arising out of the article retained, but for a balance of accounts relating to dealings of a like nature. In the cases where the question has arisen in this country, they have been placed, as to lien, upon the footing of common carriers, (Angell on Carriers, p. 68, sec. 66,) and these have only a specific or particular lien, (Ib., p. 348, sec. 357,) unless by express agreement or by evidence that such had been the common mode of previous dealings between the particular parties ; or by “ common usage affecting the custom of the whole realm,” established by strong and satisfactory evidence of ancient numerous and important instances in which the right has been exercised —• general lien being an encroachment upon the com-moa law, and is consequently regarded by the courts with much jealousy. Ib., p. 348, secs. 357, 358. The defendant below having placed his refusal to deliver the cotton on a ground to which even a general lien would not reach —the payment of a sum of money which had no relation to dealings of a like nature — cannot now set up his particular lien for the storage as an excuse for not having delivered the cotton. Nor was it necessary, after the refusal upon the ground upon which it was placed, that the plantiff below should have made a formal tender of the amount due for storage. Such an act would have been but an idle ceremony, when no mention was made of it at the time, (Boardman vs. Sill, 1 Camp. 410 n,) and the condition of the delivery was so far beyond its scope. The next ground assumed is, that Scott was not liable to Jester but to Barkman, if to any one, the latter having the indicia of property in the cotton, and dealt with it as his own. This position is also untenable. Jester was the true owner of the cotton, although Barkman had a special property in it before it was sold. The bringing of the suit by Jester affirmed the contract between Barkman and Scott, as to the storage and shipment. The violation of this contract and Scott’s misconduct, was Jester’s injury, whether the remedy sought for it was asserted in Barkman’s name or his own. Where A agreed with B, a common carrier, for the carriage of goods, and B, without A’s direction or knowledge, agreed for the carriage with C, who, without A’s knowledge, agreed with D, a third carrier, it was held that A might maintain his action against D for not delivering the goods, and that by bringing, the action, A affirmed the contract made with D by 0, and could not afterwards recover from B. (Sanderson vs. Lamberton, 6 Binn. 129.) The same principle applies to the case at bar. The last position assumed is, that the damages recovered are excessive. We think them full enough; but not sufficiently exorbitant, in view of the whole evidence, and of the importance of the principle involved, to warrant the interference of the court on that ground. In cases of this kind, in general, the public con-veníence, and the importance of upholding the safety, certainty,, and the freedom of trade and commercial intercourse, should justly have some influence in the deliberation of juries. And not less so in this State, where such important and increasing agricultural interests are, by the common consent of trade, committed to forwarding merchants, warehouse men, carriers, and other commercial agents. And having now examined all the points mooted by counsel, we have but to announce our conclusion that we have found no error for which the judgment should be reversed, and consider that it shall be affirmed.